AO 91 (Rev. 11/11) Criminal Complaint

AUSA Sean Franzblau (312) 353-5305

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

DEC 10 2018

UNITED STATES OF AMERICA

v.

RICARDO SANTAMARIA,
also known as "Fut" and "Pescue"

CASE NUMBER:

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**18CR 846**

MAGISTRATE JUDGE COX

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than July 3, 2017 and continuing through at least July 12, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 846 and 2 | Aided and abetted the attempted distribution of 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 846 and 2. |

This criminal complaint is based upon these facts:

_X_  Continued on the attached sheet.

MICHAEL KOCH
Special Agent, Drug Enforcement Administration
(DEA)

Sworn to before me and signed in my presence.

Date: <u>December 10, 2018</u>

_Judge's signature_

City and state: Chicago, Illinois

SUSAN COX, U.S. Magistrate Judge
_Printed name and Title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS
ss

## AFFIDAVIT

I, MICHAEL KOCH, being duly sworn, state as follows:

## I. PRELIMINARY MATTERS

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since approximately June 2010. During my time with the DEA, I have gained extensive experience in covert methods for investigating narcotics trafficking, including through the use of undercover agents, confidential sources, and covertly recording suspected narcotics traffickers and their associates.

2. This affidavit is submitted in support of a criminal complaint alleging that Ricardo SANTAMARIA (a/k/a "FUT" a/k/a "PESCUE"), has violated Title 21, United States Code, Sections 846 and 2 (aiding and abetting the attempted distribution of cocaine). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SANTAMARIA with aiding and abetting the attempted distribution of five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information provided to me by confidential sources, my review of undercover recordings and transcriptions/translations, cell phone records, my training and experience and other evidence.

4.     Reference is made to consensually recorded conversations in this affidavit. At various points in the affidavit, I will offer my interpretations of these recorded/intercepted conversations in brackets and otherwise. My interpretations of these conversations are based on the contents and context of the conversations, prior and subsequent conversations, the results of physical surveillance, information provided by a cooperating individual, and on conversations with other officers and agents, and my knowledge of the investigation as a whole.  Moreover, the voice identifications for the conversations set out below are preliminary.  The identification of some individuals involved in these conversations and meetings has not yet been completed. Some of these summaries do not include references to all the topics covered during the course of the conversations.  The times listed for the recorded conversations are approximate.  In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. Finally, the summaries are based upon draft—not final—transcriptions of the recorded conversations.

## II.  SUMMARY

5.     In July 2017, RICARDO SANTAMARIA brokered a cocaine sale for an individual who, unbeknownst to SANTAMARIA, was a DEA confidential source. Specifically, as explained below, SANTAMARIA arranged for his unidentified Mexican source of supply ("Individual A") to sell ten kilograms of cocaine to the confidential source's "customer" in the Chicago area. Unbeknownst to SANTAMARIA and Individual A, the confidential source's customer was an undercover DEA agent. On the day of the planned cocaine sale, investigating agents seized ten kilograms of cocaine from Sergio Avarca Baldavino and Miguel Pacheco as they attempted to deliver Individual A's cocaine to the UC.

## III.  FACTS SUPPORTING PROBABLE CAUSE

6.     In or around 2017, a cooperating defendant (CS-1) identified RICARDO SANTAMARIA, who CS-1 also knew as "Fut" and "Pesque," as a wholesale narcotics trafficker based in McAllen, Texas.[1] According to CS-1, CS-1, SANTAMARIA, and another individual (who later began cooperating with the government, "CS-2") worked together in 2016 to receive in McAllen large shipments of cocaine that had been smuggled across the Texas/Mexico border, and to distribute the cocaine to

---

[1] CS-1 has no prior felony convictions. At the time CS-1 provided information regarding SANTAMARIA, he/she had been charged with federal narcotics trafficking offenses, and was cooperating in the hopes of receiving a reduced sentence. As of December 10, 2018, narcotics trafficking charges remain pending against CS-1 (in the same case). CS-1 has continued to cooperate with the government since the summer of 2017, and the government expects to soon enter into a plea agreement with CS-1 in which the government agrees to make a downward departure request at sentencing pursuant to Guideline § 5K1.1. I believe CS-1 is a credible source, as the information he/she has provided has been corroborated in significant respects by substantial independent evidence, including consensual recordings, physical surveillance, witness interviews, and narcotics seizures.

different cities around the United States. Specifically, according to CS-1, he/she had been involved in setting up and operating warehouses and front companies that posed as distributors of legitimate consumer goods, such as furniture, laundry detergent, and food products. In fact, according to CS-1, the warehouses functioned as cocaine distribution hubs, sending and receiving large loads of cocaine and narcotics proceeds transported between warehouses in concealed semi-truck shipments. According to CS-1, in or around 2016, both SANTAMARIA and CS-2 had opened and operated such cocaine distribution front company/warehouses in McAllen, Texas and Houston, Texas, respectively, through which hundreds of kilograms of cocaine and millions of dollars in narcotics proceeds had been distributed.

      7.    In or around May 2017, agents asked CS-1 to call CS-2 and attempt to convince him/her to cooperate on CS-1's behalf. While in custody, CS-1 placed a recorded phone call to CS-2 that was monitored by agents. During the call, CS-1 explained that he/she was in custody and was cooperating with the government. CS-1 further explained that CS-2 could help CS-1 by cooperating with the government, and earning third-party cooperation credit for CS-1. CS-1 further explained that CS-2 was under no obligation to assist the government. CS-2 agreed to cooperate on CS-1's behalf. [2]

---

[2] CS-2 has no prior felony convictions. As set out above, CS-2's initial motivation for cooperating was to earn third-party cooperation credit for CS-2. However, in or around July 2017, after agents gathered additional facts about CS-2's own historical involvement in narcotics trafficking, agents explained to CS-2 that he/she may be charged in connection with narcotics trafficking. Agents further explained that any assistance CS-2 provided to the government would be considered in making a charging determination, and/or in mitigation if CS-2 was charged and convicted. At that point, I believe CS-2's motiviation for cooperating changed from helping CS-1 to receive a reduced sentence, to helping him/herself avoid

8.    In or around June 2017, agents began communicating directly with CS-2.  Agents told CS-2 they wanted him/her to identify someone who could broker the sale of multi-kilogram quantities of narcotics in Chicago.  Agents planned to have an undercover agent pose as a Chicago-based narcotics customer, and use a ruse sale scenario to identify wholesale narcotics distributors (and possible front company/warehouses used to distribute narcotics) in the Chicago area.

9.    CS-2 identified SANTAMARIA as someone who could broker a large sale of cocaine in the Chicago area.  According to CS-2 (and consistent with the information provided by CS-1), SANTAMARIA was a McAllen-based narcotics trafficker who had a direct line to wholesale narcotics suppliers in Mexico.  Agents directed CS-2 to contact SANTAMARIA to set up the undercover purchase of cocaine.

10.   On or about July 3, 2017, at approximately 2:11 p.m., at agents' direction, CS-2 placed a consensually recorded telephone call to SANTAMARIA,

---

charges or receive a reduced sentence if he/she was convicted. To date, CS-2 has not been charged in connection with his/her involvement with drug trafficking, but is still aware that he/she may be charged at some point. No promises have been made to CS-2 regarding whether or not he/she will be charged, or what his/her sentence will be if convicted. During the CS's cooperation, at the request of investigating agents, he/she traveled to Chicago, Illinois for a period of several days. Agents paid CS-2 $5,000 to cover his/her expenses associated with this trip.

I believe CS-2 to be a reliable source, as the information he/she has provided is corroborated in significant respects by independent evidence, including consensual recordings, physical surveillance, witness interviews (including CS-1), and a narcotics seizure.

using (XXX) XXX-1456 ("SANTAMARIA phone").[3][4]   During the conversation CS-2 and SANTAMARIA agreed to meet that evening at a parking lot near McAllen, Texas. Their conversation, in pertinent part, was as follows:

CS-2:          About the other, about the other that we talked about, because the other one too, the one that I proposed to you regarding the... the teeth [kilograms of cocaine].

SANTAMARIA: Oh, ok. Yeah, that would be good. Uh, so, call me back later.

CS-2:          Ok. Yeah, I'll call you after 5:00 to meet up and...[CS-2 and SANTAMARIA would meet that evening sometime after 5:00 p.m.]

[VOICES OVERLAP]

SANTAMARIA: All right, there... I'll have an... I'll have an estimate for you [SANTAMARIA would have an estimate on the cost of narcotics he could arrange for CS-2/CS-2's customer to purchase in Chicago].

CS-2:          Ok. That's fine.

SANTAMARIA: Ok, thanks.

---

[3] SANTAMARIA was identified as the user of SANTAMARIA phone as follows: (1) according to service provider records, RICARDO SANTAMARIA was the registered subscriber of SANTAMARIA phone during the time of all recorded phone calls set out in this affidavit; (2) according to CS-2, SANTAMARIA is the user of SANTAMARIA phone; and (3) in January 2018, agents physically surveilled a meeting in McAllen, Texas, between a confidential source and SANTAMARIA (who agents identified based on a comparison of the photograph contained in SANTAMARIA's Facebook profile), was the individual who agents observed meeting with the confidential source). That meeting was consensually recorded. Agents have reviewed the recording of this in-person meeting with SANTAMARIA and, based on a voice comparison, agents believe SANTAMARIA's voice is the same voice as the user of SANTAMARIA phone.

[4] The dates, times, and phone numbers of all telephone calls set out in this affidavit have been confirmed through pen data and/or toll records.

11.     Prior to the meeting, investigating agents instructed CS-2 to record the meeting.[5] According to CS-2, he/she met with SANTAMARIA on or about July 3, 2017, at approximately 7:45 p.m., at a parking lot in the McAllen, Texas area. According to CS-2, and consistent with the audio recording later provided by CS-2, during the meeting, CS-2 used coded language to inform SANTAMARIA that he/she had narcotics customers located in the Chicago area, who wanted to purchase multi-kilogram quantities of narcotics.[6] The following is an excerpt from the recording of the July 3, 2017 meeting between SANTAMARIA and CS-2:

CS-2:              What's up, man? The thing is, I'm in a hurry to go help, over here [CS-2 was in a hurry to set up the narcotics sale in Chicago].

SANTAMARIA:    In Chicago?

---

[5] All of CS-2's in-person meetings with SANTAMARIA mentioned in this affidavit occurred in the McAllen, Texas area, and were not physically surveilled by agents. Instead, agents instructed CS-2 to use a recording function on his/her cellular telephone to record the meetings, and immediately send the recordings to agents after the meetings ended. CS-2 consistently sent audio recordings to agents after he reported to have meetings with SANTAMARIA. Agents also debriefed CS-2 after the reported meetings regarding what was discussed, and CS-2's description of the meetings was consistent with the audio recordings. CS-2's reports that the meetings occurred, and the substance of the meetings, was also consistent with recorded phone calls between CS-2 and SANTAMARIA setting up the meetings, as well as the July 12, 2017 seizure of 10 kilograms of cocaine in Chicago, which, as explained below, there is probable cause to believe was the result of CS-2's recorded phone calls and meetings with SANTAMARIA.

[6] SANTAMARIA was identified as the person with whom CS-2 met on July 3, 2017, based on the following: (1) according to CS-2, SANTAMARIA is the individual with whom he/she met on July 3, 2017; (2) As set out in paragraph 10, in the afternoon of July 3, 2017, CS-2 had a recorded phone call with SANTAMARIA in which they arranged to meet later the same evening; and (3) Agents have reviewed what CS-2 claims to be a recording of his/her July 3, 2017 meeting with SANTAMARIA and, based on a voice comparison, agents believe the individual with whom CS-2 speaks in the recording is SANTAMARIA.

CS-2:              In Chicago. And right now I have... My buddy, the clients I've got in Milwaukee, he has some good clients there in Chicago. [CS-2 is pretending to have an associate with narcotics customers in Chicago.]

SANTAMARIA:       I have... I ha... Uh-huh. My nephew's working. [SANTAMARIA has either a nephew or an associate who he refers to as "nephew" involved in narcotics trafficking in Chicago.]

CS-2:              Yeah?

SANTAMARIA:       Little by little so that they can give him work. Let me talk to my guy. Let me see . . . [SANTAMARIA would talk to his associate who assists in distributing narcotics in the Chicago area.]

                  [VOICES OVERLAP]

CS-2:              What guy?

SANTAMARIA:       That I've got in Chicago.

CS-2:              Oh, in Chicago.

SANTAMARIA:       Yeah. No ... [Unintelligible] My nephew has some, but I would buy five from you [Unintelligible] [SANTAMARIA's "nephew" had narcotics, but SANTAMARIA was willing to buy five kilograms from CS-2.]

CS-2:              No, no, no. I mean, I have some to buy. I... I mean, my people buy. I want to take some to... to the guy. [CS-2 had customers in Chicago who wanted to purchase narcotics.]

[VOICES OVERLAP]

SANTAMARIA:    Oh....okay.

CS-2:    That's why I need the warehouse to...to unload [CS-2 needs a warehouse to unload narcotics to be delivered to his customers in Chicago].

SANTAMARIA:    [UNINTELLIGIBLE] That's why, let, let me move on that [SANTAMARIA will help arrange the narcotics sale to CS-2's customers].

CS-2:    What do you think?

SANTAMARIA:    No, it can be done. It's possible to open a . . .

[VOICES OVERLAP]

CS-2:    You... the... my guy buys from me at a good price. The... the square one [coded language for a kilogram quantity of cocaine].

CS-2:    Okay. But you don't have anything right now to ... to get there to unload. [CS-2 is confirming that SANTAMARIA did not then currently have a warehouse in Chicago to receive shipments of narcotics].

SANTAMARIA:    Oh, Okay.

CS-2:    [Unintelligible] I'm in a hurry. [The CS was in a hurry to supply his narcotics customers in Chicago.]

SANTAMARIA:    Yeah, yeah, yeah.

CS-2:              Ok, I need one to take down [unintelligible] there in the... in... in... in the [unintelligible].

SANTAMARIA:        Yeah.

CS-2:              And I need one to arrive with work . . . With square ones [kilograms of narcotics]. . . . Check it out, check it out, I've got your clients there, of what I take them too. Check it out, whoever has something good there and the guys [unintelligible] bad ones, they'll pay from five to ten each week. [CS-2 had narcotics customers in Chicago who could purchases between 5 to 10 kilograms of cocaine per week].

SANTAMARIA:        But it has to be good [the narcotics must be high quality].

CS-2:              It has to be good. It has to be moderately good.

CS-2:              I'll give you a percentage. [The CS will pay SANTAMARIA a percentage of the sale of the narcotics for SANTAMARIA's role in facilitating the narcotics transaction.]

SANTAMARIA:        Ok. Uh, I'll pass them over to you, both of them. My nephew... my nephew will buy you some [narcotics] now, you know? And the... the other buddy I have, has some [narcotics].

SANTAMARIA:        Ten?

CS-2:              Ten. But each [unintelligible].

SANTAMARIA:        On Wednesday, I'll have the price for you. Prices and I'll have [unintelligible][SANTAMARIA will have the price of the narcotics for CS-2 by that coming Wednesday (July 5, 2017)].

10

CS-2:               All right.

SANTAMARIA:    Ok. Good to go.

CS-2:               All right. Take care.

12.     On or about July 5, 2017, at approximately 11:17 a.m., the CS-2 placed a consensually recorded telephone call to SANTAMARIA on SANTAMARIA phone. During the conversation, CS-2 asked SANTAMARIA about the status of the 10 kilogram cocaine sale he/she was attempting to arrange. Their conversation, in pertinent part, was as follows:

CS-2:               Uh, I'm calling you because... in regards to... to what we had talked about that day about the... about the guys I've got there in the chi... in Chicago. [The CS is calling to check on the status of the narcotics transaction that the CS and SANTAMARIA discussed on July 3, 2017.]

SANTAMARIA:    Oh...

                   [VOICES OVERLAP]

CS-2:               Because the guys from Milwaukee called me back and asked me what the deal was, because... [CS-2's narcotics customers called and asked about the status of the narcotics transaction.]

                   [VOICES OVERLAP]

SANTAMARIA:    Oh, yeah... yeah, let me call him... [Let me call my narcotics source.]

[VOICES OVERLAP]

CS-2:                      ...he wants to do it there...

SANTAMARIA:       Let me call the family members that I have there... to see if... if...
                         if, uh, if he's available right now. [SANTAMARIA was going to
                         call relatives with narcotics in the Chicago area to see if they can
                         supply CS-2's customers.]

CS-2:                      Ok. Sounds good.  Will you call me back, or?

SANTAMARIA:       Yeah, yeah, I'll... I will call you. Let me... let me find him first,
                         because I talked to him, but since I told him that I wanted cash,
                         well, it wasn't... it wasn't going to get done... we weren't going to
                         talk about that, but I think he wanted to talk today, so, let me...
                         let me find him and when I do I will call you. [SANTAMARIA will
                         call the CS after he has talked with his narcotics source.]

13.     On or about July 5, 2017, at approximately 11:54 a.m., CS-2 missed a
telephone call from SANTAMARIA phone. At approximately 11:57 a.m., CS-2
returned SANTAMARIA's call and during the ensuing recorded conversation,
SANTAMARIA, in summary, told CS-2 that SANTAMARIA had located a narcotics
source of supply in Mexico who would supply CS-2's customers in Chicago.
SANTAMARIA told CS-2 that the price per kilogram was $28,000.[7] The following is
a partial transcript of CS-2's telephone conversation with SANTAMARIA:

SANTAMARIA:       [T]here's... there's... there's some available [narcotics were
                         available for sale in Chicago].

---

[7] Based on my training and experience, I am aware that $28,000 was within the range of
wholesale prices for a kilogram of cocaine in the Chicago, Illinois, area in July 2017.

CS-2:            Ok.

SANTAMARIA:      They just have the number 28. [The price is $28,000 per kilogram of cocaine.] I'm not sure... what do you think?

CS-2:            It's fine, it's fine. Because I have a number that's a little higher, that they're paying me well for, all the same. [CS-2 agreed to the price.]

SANTAMARIA:      Oh, all right. Um... How... how do we do it? Do I give the dude this number so he calls you? And you and him decide.

                 [VOICES OVERLAP]

CS-2:            Yeah, that's fine. Obviously you... [CS-2 gave SANTAMARIA permission to pass the CS's phone number to the narcotics source in Mexico.]

SANTAMARIA:      He's from Mexico. Yeah. He's... he's going to call you from Mexico, ok? [The Mexico-based narcotics source of supply, "Individual A," would call CS-2].

CS-2:            Ok. He's from Mexico?

SANTAMARIA:      Yeah, the owner. [Individual A, the owner of the narcotics, was based in Mexico].

CS-2:            Ok.

| | |
|---|---|
| SANTAMARIA: | Uh-huh, but I'll give him your number so he calls you. You'll just go... you'll go on behalf of Primo. I'm Primo. [SANTAMARIA told CS-2 to use the code phrase "on behalf of Primo" when he spoke with Individual A].[8] |
| CS-2: | Ok. You're Primo? |
| SANTAMARIA: | I told him... Yes, I'm the cousin ["primo" in Spanish]. You're going to... to... to say to go... you'll go on behalf of Primo. |
| CS-2: | Okay. |
| SANTAMARIA: | That's ... that's what people who know me call me over there. |
| CS-2: | Ok. |
| SANTAMARIA: | Um... You can work something out with him. |
| CS-2: | All right, done... |
| | [VOICES OVERLAP] |
| SANTAMARIA: | When? |
| CS-2: | So he has... He has everything... he has there [unintelligible]? [CS-2 is confirming that Individual A had sufficient quantities of narcotics in Chicago to complete the 10 kilogram cocaine sale]. |

---

[8] Based on my training and experience, I know that, when a narcotics broker arranges a sale between a source of supply and a new customer, it is a common practice for the new customer to use a code phrase such as "on behalf of [X—typically a codename to identify the broker]" to confirm identities and show the supplier that he/she is dealing with an individual for whom the broker has vouched (i.e. someone who is not associated with law enforcement).

SANTAMARIA:    (unintelligible) has more. Yeah, yeah he has even more. [Individual A had more than 10 kilograms of cocaine available for sale in Chicago.]

CS-2:    Ok. That's fine.

SANTAMARIA:    All right. I'll... I'll send him your number right now and he can contact you guys. [SANTAMARIA will pass the CS-2's phone number to Individual A].

CS-2:    All right, then.

14.    Later on or about July 5, 2017, at approximately 12:24 p.m., CS-2 missed a phone call from SANTAMARIA phone. At approximately 12:26 p.m., CS-2 called SANTAMARIA phone, and SANTAMARIA answered. In summary, SANTAMARIA told CS-2 that Individual A preferred to speak to CS-2 while CS-2 was in the physical presence of SANTAMARIA. CS-2 and SANTAMARIA agreed to meet later that day at around 2:00 p.m. in a parking lot in the McAllen, Texas area, where CS-2 could then speak to Individual A by telephone in SANTAMARIA's presence. At approximately 2:28 p.m., CS-2 called SANTAMARIA, using SANTAMARIA phone, and SANTAMARIA told CS-2 that he was waiting for CS-2 in the parking lot. CS-2 told SANTAMARIA he/she would be there shortly.

15.    According to CS-2, and corroborated by an audio recording that CS-2 provided to agents, at approximately 2:45 p.m., CS-2 met with SANTAMARIA inside the CS-2's vehicle in a parking lot in the McAllen, Texas area. Below is an excerpt of the recorded conversation that, according to CS-2, took place between him/her and

SANTAMARIA in CS-2's car, while CS-2 and SANTAMARIA waited to speak with

Individual A by telephone.[9]

| | |
|---|---|
| SANTAMARIA: | Uh... uh... the guy does have several. [The CS source has several kilograms of narcotics in the Chicago area.] |
| CS-2: | Really? |
| SANTAMARIA: | Yeah. It's just that...he doesn't trust people, but he doesn't... doesn't... |
| | [VOICES OVERLAP] |
| CS-2: | [Unintelligible] that's normal, man. |
| SANTAMARIA: | Yeah. I told him, 'You know what?' |
| | [VOICES OVERLAP] |
| CS-2: | He doesn't know me at all. |
| SANTAMARIA: | I told him, "Don't worry, he's..." [SANTAMARIA vouched for CS-2 to Individual A.] |
| CS-2: | No, that's why... that's why... those guys buy ten kilos from you, dude You have to start out everything that way. |
| SANTAMARIA: | (unintelligible) brother? |

---

[9] SANTAMARIA was identified as the individual who met with the CS on July 5, 2017 in the same manner as described in footnote 6 above.

CS-2:                   No, yeah, dude. Easily. We can do it. Uh, what was I going to say? The... the good thing is that it's... You... you take one first. The... it's good... Are they good or what? [CS-2 asked SANTAMARIA if Individual A's narcotics were high quality].

SANTAMARIA:        They... they should be good. [The quality of the narcotics should be good.]

CS-2:                   Right. They're really good, right away [unintelligible] two of the same ones [CS-2 stated his/her Chicago customers would purchase more cocaine from Individual A if the initial 10 kilograms were of good quality].

16.     According to CS-2, and corroborated by the audio recording provided by CS-2, at approximately 2:50 p.m., SANTAMARIA received a call from an individual who SANTAMARIA identified as his narcotics source (Individual A). SANTAMARIA passed the telephone to CS-2 so that CS-2 and Individual A could discuss the planned Chicago cocaine sale directly. Only CS-2's half of the conversation was captured on the recording. Below is an excerpt of the conversation that, according to CS-2, took place while CS-2 was speaking to Individual A on SANTAMARIA's telephone:

CS-2:                   Oh, you know that I have some good [narcotics] customers over there, uh, in Milwaukee and they have people over in... in... in Chicago too, so... so we can get some parts for the motor. Um, the... they're going to arrive in Ch... Go ahead. [CS-2 told Individual A that he/she had good narcotics customers in Chicago who were looking to purchase narcotics ("parts for the motor" is coded language for kilograms of narcotics)].

                        (INAUDIBLE RESPONSE)

17

CS-2:            Yeah, there in Chicago. They're from Chicago, the ones that they have there.

                (INAUDIBLE RESPONSE)

CS-2:            Yeah. No, I know. Um, it's important to have people you trust and above all, that they check one, they pay for it and they take the paper, going and going.

                (INAUDIBLE RESPONSE)

CS-2:            They get tens. They buy ten, five, ten. And then, well, while they're buying they gain your trust too... with you guys, um, well, they get a little more, but in the meantime, five, ten, cash. [The CS's customers buy five or ten kilograms at a time, and will pay up front in cash].

                (INAUDIBLE RESPONSE)

CS-2:            That's right, that's right. They would pay for one, they check it, it's fine, they just need to confirm that the other ones are good too, right? And that's it. [CS-2's Chicago customers would pay cash for one kilogram of narcotics at first, and if the narcotics were high quality, then the CS's customers would purchase additional kilograms].

                (INAUDIBLE RESPONSE)

CS-2:            I... I have someone I trust there. Someone I trust a lot that's there, or if not I'll go or... or... or... I have someone there that I trust that has always helped me.

                (INAUDIBLE RESPONSE)

CS-2:           No, yeah, yeah. Someone really close to me from my ranch.
                Someone that's really close to me that... that has always
                helped me.

                (INAUDIBLE RESPONSE)

CS-2:           Oh, no, no, no, no. Of course not. These people aren't... they're
                not runners, nothing like that.

                (INAUDIBLE RESPONSE)

CS-2:           Uh, my people, they're like, they're going to be... they're going
                to be the middleman, they're going to be there as the
                middleman.

                (INAUDIBLE RESPONSE)

CS-2:           Au... Yeah.

                (INAUDIBLE RESPONSE)

CS-2:           That's right. Right. Just like that, exactly like that.

                (INAUDIBLE RESPONSE)

CS-2:           No, no, beca...

                (INAUDIBLE RESPONSE)

CS-2:           Exactly. Then they make some money and then they want to
                go off on their own and it doesn't... doesn't work.

(INAUDIBLE RESPONSE)

CS-2:    Whi... whi? Oh, that's fine. Um, the price that this guy gave me he already gave it to you, right? He did. Your price. [The CS is confirming that the price SANTAMARIA had earlier provided ($28,000 per kilogram) was correct.]

SANTAMARIA:    Of that car motor. [Coded language for kilogram of narcotics]

CS-2:    Of the motor?

(INAUDIBLE RESPONSE)

CS-2:    OK, all right. No problem, then.

(INAUDIBLE RESPONSE)

CS-2:    Yeah, yeah. (unintelligible) 28, mine. [$28,000 per kilogram.]

(INAUDIBLE RESPONSE)

CS-2:    All right, sir. So, nice to meet you and... and...

(VOICES OVERLAP)

SANTAMARIA:    Tell... tell... tell him to call you (UNINTELLIGIBLE)

CS-2:    Call my phone. Whenever you need anything, call my phone at the... at the one that he gave you. Mine is private, it's a private line.

SANTAMARIA:     Hello [CS-2 apparently handed SANTAMARIA's phone back to him].

CS-2:           Did he... did he hang up already?

SANTAMARIA:     So, what did you agree on?

CS-2:           Yeah, it's done. It's all done, dude [CS-2 told SANTAMARIA that CS-2 and Individual A had agreed on terms for the narcotics sale in Chicago].

17.     According to CS-2, and consistent with the audio recording provided by CS-2, during the CS-2's conversation with Individual A (who, according to the CS, was a Spanish speaking male), Individual A agreed to sell CS-2's drug customers 10 kilograms of cocaine at $28,000 per kilogram.

18.     Later on or about July 5, 2017, at approximately 5:04 p.m., a few hours after the in-person meeting, CS-2 called SANTAMARIA, using SANTAMARIA phone. During the call, CS-2 asked SANTAMARIA when CS-2 could expect to receive a telephone call from Individual A. SANTAMARIA told CS-2 he would send a message to Individual A with instructions to contact CS-2.

19.     Later the same day, at approximately 5:45 p.m., CS-2 missed a telephone call from the SANTAMARIA phone. At approximately 5:47 p.m., CS-2 called the SANTAMARIA phone, and SANTAMARIA answered. Their conversation, in pertinent part, was as follows:

SANTAMARIA:     He said you told him that you were going to send us a number so
                they could call your friend, over there. [Individual A was waiting
                on CS-2 to pass SANTAMARIA the contact information for CS-
                2's Chicago narcotics customers].

CS-2:           Oh, good. Does he want... want the number?

SANTAMARIA:     Well, so... so I can send it to him.

CS-2:           Oh, good. That's good.

SANTAMARIA:     Well, I'll tell him to call. You can come to an agreement with him.

CS-2:           Well, tell him to call me if he wants. Is... is your friend going to
                call me or the friend from over there, or who?

SANTAMARIA:     No, well, my friend, so you can come to an agreement with him,
                and you guys can... work it out if you want to. [Individual A will
                contact the CS so they can further discuss the narcotics
                transaction.]

CS-2:           Well, yeah. Um, sounds good.

SANTAMARIA:     All right, then, boss.

CS-2:           All right, then.

        20.     On or about July 6, 2017, at approximately 10:51 a.m., CS-2 missed a

telephone call from Mexico telephone number 52-331-XXX-3179, believed to be used

by Individual A, as set out below. At approximately 10:56 a.m., CS-2 missed a

telephone call from SANTAMARIA phone. At approximately 10:57 a.m., CS-2 called

22

SANTAMARIA phone and SANTAMARIA answered. During the recorded call, SANTAMARIA told CS-2 that he/she had missed a call from Individual A. Their conversation, in pertinent part, was as follows:

SANTAMARIA: Hey, that guy [Individual A] was calling you. He says that you didn't answer him.

CS-2: Oh, it's because I'm eating lunch. Yeah, tell him to call me again, if you want.

SANTAMARIA: [Unintelligible] All right.

CS-2: It's a... it's a three, three. Something like that, right? [CS-2 asked if Individual A's Mexico telephone number started with the numbers 3, 3.]

SANTAMARIA: Yeah, it's from outside [outside the United States, i.e., Mexico].

CS-2: Three, three, something, right?

SANTAMARIA: Yeah.

CS-2: OK. Tell him to call me.

SANTAMARIA: All right.

21. Later on or about July 6, 2017, at approximately 11:11 a.m., CS-2 received a call from Individual A at Mexico phone number 52-XXX-XXX-3179.[10]

---

[10] According to CS-2, the user of the 3179 sounded like the same individual with whom CS-2 spoke to over SANTAMARIA's phone on July 5, 2017, to finalize the Chicago cocaine sale.

During the call, CS-2 and Individual A ("IA") discussed a general time frame of when the narcotics transaction might occur in the Chicago area. Their conversation, in pertinent part, was as follows:

IA:    Um, the guy [SANTAMARIA] told me to... to... to call you, it's just that I couldn't... I cou ... no, I went out to run an errand and I came back a little late, and I couldn't call you anymore.

CS-2:   No, no [unintelligible] no... there's no problem, man. We're here to serve.

IA:    Uh-huh. Uh-huh. Ok, tell me.

CS-2:   No, well, it's jus... it's just to verify that and... and when it can be done... regarding the piece to... to start looking into it . . . start sorting out my clients in time and the... the guy that's over there. [CS-2 asked Individual A if the planned narcotics transaction was still on. If so, CS-2 told Individual A that he/she needed to inform his/her Chicago based narcotics courier.]

IA:    Ok. Um, mm, right now let me... get things right now [unintelligible] with these people to see if... if they want to meet today with these guys [unintelligible] I'll call you so... [Individual A would reach out to his narcotics couriers in Chicago to see if they were able to meet with CS-2's customers that day].

CS-2:   Okay.

IA:    You can give them the number so you guys can sort it out. Yeah? [Individual A asked if CS-2 could pass CS-2's customer's phone number to Individual A's narcotics couriers (who would be delivering the cocaine) to work out the details of their meeting].

CS-2:   All right, well, its fine by me, man.

IA:              Ok…. Right now, I'll call you later.

22.    On or about July 9, 2017, at approximately 12:41 p.m., the CS received a call from Individual A, using Mexico telephone number 52-XXX-XXX-3179. During the call, Individual A asked the CS to send the telephone number for his/her Chicago-based narcotics customer to SANTAMARIA, who in turn would provide Individual A with the telephone number. Their conversation, in pertinent part, was as follows:

IA:              Oh, um, listen, um, do you have the number for the guy from there, from Los Vientos ["the winds," code for Chicago, the "Windy City"] so they can meet him? See if they can meet today.

CS-2:        Well, that guy, Ricardo, had told me that supposedly not until Monday. And I told the guys that… that if it… [SANTAMARIA told the CS that the narcotics couriers wouldn't be available to conduct a transaction until Monday.]

                [VOICES OVERLAP]

IA:              Uh-huh.

CS-2:        …that if they could meet early Monday.

                [VOICES OVERLAP]

IA:              Um… Uh-huh. Well, it… it would be nice if you could give me the number today so they can call today and then tomorrow… they can meet early tomorrow.

CS-2:        Ok, Ok. Um…

(VOICES OVERLAP)

IA:                Right?

CS-2:            ...let me... let me... let me call them so I can inform them that I'm
                 going to give you the numbers later on.

IA:                Oh, ok. So, [unintelligible]. Give it to... give the number to m... to
                 my cousin and he'll send it to me. [Individual A told CS-2 to give
                 SANTAMARIA the phone number for CS-2's Chicago narcotics
                 customer, and SANTAMARIA would pass the number to
                 Individual A].

CS-2:            All right, then.

IA:                Ok. We'll all set. Ok.

21.    Later on or about July 9, 2017, at approximately 1:48 p.m., CS-2 called

SANTAMARIA on SANTAMARIA phone and, at agents' direction, provided

SANTAMARIA with a DEA undercover agent's cell phone number (agents planned

to have the undercover agent pose as the CS's narcotics customer in the Chicago

area). The conversation, in pertinent part, was as follows:

CS-2:            Just to let you know that... that your guy called me . . . he asked
                 me for the number, right? For the boys. [Individual A called the
                 CS and asked for the number of the CS's Chicago-based narcotics
                 customer.]

SANTAMARIA:    Ok.

CS-2:            I'm going to giv... he asked me if I would give it to you so that you could give it to him . . . Grab a pen there so that... No, no, grab a pen so you can write it down, since I'm driving, man. [Individual A told CS-2 to give the telephone number for CS-2's Chicago narcotics customers to SANTAMARIA to give to Individual A]

SANTAMARIA:      I'm also driving . . . Let me... let me pull over, hold on the thing is . . . The thing is there's a red light here, let me pull over so... so I can write it down real quick . . . What's the number?

CS-2:            [CS-2 provides the UC's phone number and SANTAMARIA repeats it back]

CS-2:            Tell him you're calling on behalf of Tigre. To talk to... to... to ask for Beto. [Code phrase to be used to verify the identity of the individuals involved in the narcotics transaction.]

SANTAMARIA:      Ok, well, I'll... I'll... I'll mention it. [SANTAMARIA will give Individual A the telephone number and code phrase].

CS-2:            All right, I'll be [unintelligible]. I'll wait for your call, or a ca... a call from the guys over there from . . . Chicago. Okay?

SANTAMARIA:      All right.

22.    On or about July 10, 2017, at approximately 2:14 p.m., CS-2 spoke with SANTAMARIA, using SANTAMARIA phone, and advised him, in summary, that his/her narcotics customer in Chicago had not received any telephone calls. SANTAMARIA confirmed to the CS that he had passed the (UC's) phone number to Individual A on July 9, 2017.

23.     On or about July 10, 2017, at approximately 4:03 p.m., the UC missed a phone call from telephone number (XXX) XXX-5470. At approximately 4:05 p.m., the UC missed a phone call from telephone number (XXX) XXX-7005.

24.     At approximately 5:02 p.m., the UC called back telephone number XXX-XXX-5470. According to the UC and the audio recording, a Spanish-speaking male, later identified as Sergio Avarca-Baldavino (as set out below), answered the phone. During the call, the UC and Avarca-Baldavino greeted one another. Avarca-Baldavino then used the "El Tigre" code phrase that CS-2 had passed to SANTAMARIA (to pass to Individual A). Avarca-Baldavino then stated that he had been instructed to reach an "agreement" with the UC. The UC and Avarca-Baldavino then arranged to meet on July 11, 2017, at a parking lot in Deerfield, Illinois.

25.     On or about July 11, 2017, at 3:09 p.m., the UC met with two individuals, later identified as Sergio Avarca-Baldavino and Miguel Pacheco, in a public parking lot in Deerfield, Illinois.[11] In summary, during the meeting, which was physically surveilled and audio recorded, Avarca-Baldavino told the UC he had "two" with him, which the UC understood to mean 2 kilograms of cocaine, and asked the

---

[11] As set out below, Avarca-Baldavino and Pacheco were arrested on July 12, 2017, as they attempted to deliver the 10 kilograms of cocaine to the UC. Both were identified after their arrest. On July 13, 2017, Avarca-Baldavino and Pacheco were charged in the Northern District of Illinois with one count of possessing with intent to distribute 5 kilograms of more of cocaine, in violation of 21 U.S.C. § 841(a)(1) (case number 17 CR 474). Both defendants were convicted in 2018.

Agents interviewed Avarca-Baldavino after his July 12, 2017 arrest. One of the interviewing agents has reviewed the audio recording of the UC's July 11, 2017 meeting with Avarca-Baldavino and the audio and video recording Avarca-Baldavino's post-arrest interview. According to the interviewing agent, he recognized Avarca-Baldavino to be the user of telephone number XXX-XXX-5470 and XXX-XXX-7005 in the calls set out in this affidavit.

UC if he wanted the narcotics at that time. The UC responded that he did not yet have the money ready, and that he wanted to purchase a total of 10 kilograms from Avarca-Baldavino. The UC and Avarca-Baldavino then agreed to meet the following day to complete the 10 kilogram cocaine sale.

26.     On or about July 12, 2017, the UC participated in multiple consensually recorded telephone calls and text messages with Avarca-Baldavino, using telephone number XXX-XXX-7005. In summary, during the calls, the UC and Avarca-Baldavino agreed to meet later that day at approximately 4 p.m. in the parking lot of a Macy's department store located in Gurnee, Illinois, to complete the 10 kilogram cocaine sale.

27.     On or about July 12, 2017, at approximately 3:57 p.m., law enforcement initiated a traffic stop of Avarca-Baldavino and Pacheco, who were traveling in a white pickup truck driven by Individual A, near the intersection of Greenwood Avenue and Jackson Street in Waukegan, Illinois. At the time of the traffic stop, the white pickup truck was traveling toward the Macy's store in Gurnee at which the UC and Avarca-Baldavino had agreed to meet to complete the cocaine sale. During the traffic stop, Individual A gave consent for law enforcement to search the white pickup truck. Inside the pickup truck, officers located a cooler that contained approximately ten kilograms of a substance that field-tested positive for the presence of cocaine. Forensic lab analysis later confirmed the substance seized from the cooler contained cocaine, with a net weight of over 10 kilograms.

28.    Also located in the white pickup truck were multiple cell phones. One of

the phones was assigned telephone number 847-641-7005 (the second number from

which the UC had a missed call on the afternoon of July 10, 2017). Individual A,

Avarca-Baldavino and Pacheco each denied ownership of the phone. A search of the

cell phone revealed that on or about July 10, 2017, at approximately 2:47 p.m., a text

message was received from a Mexico telephone number, 52-XXX-XXX-3827, which

stated "XXX-XXX-9704 [the UC's phone number] con el tigre departe de beto [the

"tigre" code phrase the CS provided SANTAMARIA on or about July 9, 2017 in

connection with the 10 kilogram cocaine sale]."

29.    On or about July 18, 2017, at approximately 9:16 p.m., CS-2 had a

recorded conversation with SANTAMARIA, using SANTAMARIA phone, about the

July 12, 2017 cocaine seizure:

SANTAMARIA:    Um, I called that guy... the  guy from over there from the outside.
               [SANTAMARIA called Individual A, who is based in Mexico.]

CS-2:          Yeah.

SANTAMARIA:    And he asked me if your friends had seen those people, or if they
               had just spoken with them on the phone. [Individual A asked if
               CS-2's narcotics customer had met with Individual A's narcotics
               couriers (Avarca-Baldavino and Pacheco), or only spoken to them
               by phone].

CS-2:          Oh, the truth is, I don't know. Oh, they told me something about...
               Yeah, it seems like they met with him.

SANTAMARIA:    Oh.

CS-2:    They met with one of the guys [CS-2's customer met with Avarca-Baldavino].

SANTAMARIA:    All right.

CS-2:    But he never . . . never... the... the... the... the guy that was going to arrive with him never showed up. I don't know how things were. But those guys here... I told them what you had told me [Avarca-Baldavino and Pacheco never arrived with the drugs to deliver to CS-2's customer].

SANTAMARIA:    Uh-huh . . . Oh, all right, so, there, so if something [U/I] let... let me know . . . I think they had . . . they had problems there, that... that someone there wanted... hmm, I don't know... I... I... I... didn't understand this guy [Individual A] very well, telling him that... that they had... how do I tell you? That a person is going around there and they are... they are, what do you call it? Informing [Individual A's couriers, Avarca-Baldavino and Pacheco, had problems with law enforcement while attempting to deliver the cocaine to CS-2's customer, and Individual A and SANTAMARIA are concerned that someone involved in the sale was acting as a law enforcement informant].

## IV.   CONCLUSION

30.    Based on the foregoing, I respectfully submit that there is probable cause to believe that beginning no later than July 3, 2017, and continuing through at least July 12, 2017, RICARDO SANTAMARIA aided and abetted the attempted distribution of a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846 and 2.

FURTHER AFFIANT SAYETH NOT.

MICHAEL KOCH
Special      Agent,      Drug      Enforceme
Administration

SUBSCRIBED AND SWORN to before me on December 10, 2018.

SUSAN COX
United States Magistrate Judge